UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ERIC COOPER,<br>　　　Plaintiff,<br><br>v.<br><br>SKILLZ, INC., ANDREW PARADISE<br>and CASEY CHAFKIN,<br>　　　Defendants. | )<br>)<br>)<br>)　Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**I.     INTRODUCTION**

Plaintiff Eric Cooper ("Cooper") brings this action against Skillz, Inc., his former employer ("Skillz" or the "Company"), and its founding majority shareholders to recover damages for his wrongful termination in violation of federal and state disability discrimination laws, for breach of his employee equity agreements, and for failure to pay his final wages in violation of the Massachusetts Wage Act.  As set forth below, Skillz recruited Cooper to both invest in and work for the company, then terminated him because he had become temporarily disabled, revoked his vested employee equity in bad faith and without contractual cause, as well as withheld his final wages.

**II.     THE PARTIES**

1.     Plaintiff Eric Cooper is an individual residing in Worcester County, MA.  He suffers from a lumbar back disorder which is episodic in nature, but substantially limits his ability to walk, bend, sit and work full-time during a flare-up.

1

2. Defendant Skillz, Inc. is a Delaware corporation formed in 2012 and in the mobile gaming industry with principal place of business at 200 State Street, Boston, MA 02109.

3. Defendant Andrew Paradise ("Paradise") is the Chief Executive Officer and founder of Skillz. At all times relevant to this complaint, Paradise resided in Boston, MA and worked at Skillz's Boston office.

4. Defendant Casey Chafkin ("Chafkin") is the Chief Operating Officer and a founder of the Company. At all times relevant to this complaint, Chafkin resided in San Francisco, CA and worked at Skillz's San Francisco office. Paradise and Chafkin shall also be known as the "Founders".

### III. JURISDICTION AND VENUE

5. This action is based on a federal statute, the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 et seq. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 42 U.S.C. § 2000e-5.

6. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the Plaintiff's state law statutory and common law claims because they arise out of the employment relationship that underlies his federal discrimination claims.

7. All administrative prerequisites to a judicial determination have been met. On May 13, 2015, Cooper timely filed a Charge of Disability Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission against Discrimination ("MCAD") within 300 days of his discriminatory termination.

8. On June 29, 2015, the EEOC/MCAD allowed Cooper's request to withdraw his Disability Discrimination charge to pursue his claims in court.

9. The EEOC issued a right to sue letter on June 29, 2015.

## IV.   FACTS

### A.   Skillz Recruited Cooper, Already an Investor, with Promises of Valuable Employee Equity.

10.   In 2012, Paradise and Chafkin founded Skillz, Inc.  Around the same time, Paradise solicited Cooper to invest in the new company and Cooper became one of Skillz' first investors.

11.   Beginning in January of 2013, Paradise and Chafkin recruited Cooper, who holds degrees in accounting and finance, to work for Skillz as its Manager of Finance and Administration.  They persuaded Cooper to leave his secure and lucrative private equity job in New York City and take a substantial pay-cut based on promises of a valuable equity interest in Skillz in the form of employee stock options.

12.   By a Notice of Option Award dated September 9, 2013, Cooper was granted 81,632 Class B Common Shares with a four year vesting schedule (25% for the first year and 6.25% on a quarterly basis thereafter).

13.   The options were granted pursuant to Skillz 2012 Equity Incentive Plan, as Amended and Restated (the "Employee Equity Agreement").  The Employee Equity Agreement provides that vested employee stock options may be revoked only upon termination of employment for "Cause" defined as:

> "with respect to the termination by the Company or a Related Entity of the Grantee's Continuous Service, that such termination is for "Cause" as such term (or word of like import) is expressly defined in a then-effective written agreement between the Grantee and the Company or such Related Entity, or in the absence of such then-effective written agreement and definition, is based on, in the determination of the Administrator, the Grantee's: (*i*) *performance of any act or failure to perform any act in bad faith* and to the detriment of the Company or a Related Entity; (ii) *dishonesty, intentional misconduct or material breach of any agreement with the Company* or a Related Entity; or (iii) *commission of a crime*

*involving dishonesty, breach of trust, or physical or emotional harm to any person…*"

### B. "Prepare to Be Used and Abused": The Hostile Work Environment at Skillz

14. Upon working for Skillz, Cooper discovered that Paradise and Chafkin maintained a fear-based work culture in which they berate and demean employees, threaten employees with termination, and routinely terminate employees in a pique of anger.

15. Paradise and Chafkin demanded excessive work hours and it was not uncommon for them to force employees to cancel long booked travel for family vacations despite the Company's touted "unlimited vacation" policy.

16. The hostile work environment fostered by Paradise and Chafkin at Skillz has resulted in frequent staff turnover as well as a nearly 100% executive level turnover.

17. Paradise and Chafkin pressured employees to write positive online reviews of the Company in an effort to hide the harmful and damaging reviews highlighting its toxic work environment and unstable workforce.

18. Despite this pressure, highly negative reviews, such as the one quoted in the caption above, exist online, and there is a large cadre of former employees to attest to the hostile work environment at Skillz.

### C. Skillz's Founders Restricted and Controlled Cooper's Work

19. When Cooper was hired, Paradise and Chafkin guided and approved Cooper's job description and goals, which purported to give Cooper responsibility for financial and administrative functions, investor relations, and supporting an anticipated Series B funding round.

20. However, Paradise and Chafkin controlled these functions, frequently cutting Cooper out of these responsibilities altogether.

21. For example, Paradise and Chafkin created the financial model that Cooper was expected to maintain, yet Paradise and Chafkin controlled all adjustments to it. Cooper frequently told the Founders that the model was overly aggressive and that the Company would not meet its projections, only to be overruled by the Founders. In addition, Paradise stated to Cooper several times that investors found their model confusing and, throughout Cooper's tenure, the Founders stated they intended to hire a Chief Financial Officer ("CFO") to run it. When Cooper was not cut out of the process, he was excessively micromanaged to the point where he could not even send out an internal Company email without first sending it to Paradise and/or Chafkin to preapprove it.

22. In March of 2015, Paradise and Chafkin wrongly blamed Cooper for perceived inconsistencies in the company's books and bank statements regarding cash flow.

23. On the basis of these false allegations, they prepared a separation agreement, by which Cooper would receive severance and retain his vested employee stock options in exchange for a release of claims, which is the Company's standard method of terminating its employees without "Cause" as defined in the Employee Equity Agreement.

24. Instead of terminating Cooper and offering this separation agreement, Paradise told the then head of human resources that he would meet with Cooper on March 16, 2015 to "chew him out."

25. At the March 16, 2015 meeting, Paradise told Cooper that he would remain employed by Skillz and that once a CFO was hired, Cooper would report to the CFO instead of Paradise. At this meeting, Paradise also revealed to Cooper that they had been close to closing a Series B financing deal with a very prominent publicly traded gaming company, which had ultimately fallen apart a couple days earlier. Paradise blamed Cooper for the deal falling

through, consistent with his practice to find a scape goat when something went wrong with the Company. This was the first time that Cooper, who, according to his job description, was in charge of finance, learned of negotiations with said gaming company.

> D. **After Cooper Became Temporarily Disabled, Skillz Punitively Fired Him, Denied Him His Final Wages and Wrongfully Revoked His Vested Employee Equity**

26. In late March 2015, Cooper became temporarily disabled by a flare-up of his lumbar back disorder, which caused him severe debilitating pain and prevented him from sitting/bending and tolerating more than limited mobility.

27. Cooper first informed Paradise of his medical condition via email on March 29, 2015 and committed to working remotely on "mission-critical" tasks.

28. On April 1, 2015, Cooper was treated by a chiropractor, who certified his diagnosis of Neuritis/Radiculitis Thoracic/Lumbar and his total incapacity from April 1 through at least April 7, 2015.

29. On Sunday, April 5, 2015, Cooper emailed Paradise and Chafkin a health update informing them that he still had limited mobility, could not sit, and was scheduled for an MRI early in the coming week. He told them he planned to come in for the following day's meetings, but would most likely need to work shorter hours that week while he obtained medical treatment.

30. On Monday, April 6, 2015, Cooper came into the office to attend the bi-weekly Company and managers meetings. He was obviously impaired and in pain during the two hours of the meetings for which he stood awkwardly in the back corner of the room. After the meetings had ended, Cooper laid down on the floor of the back break room with ice on his back, as this was the only position that gave him some relief from the crippling pain.

31. Paradise saw Cooper at the two meetings as well as spoke to him while he was lying down in the back break room. In addition, Paradise sent Cooper several emails that day,

which revealed his annoyance with Cooper's temporary medical condition.  He asked Cooper, "[h]ave you seen your doctor about your back?  You've been out for 5+ days now so we really need you to do this if you haven't already."  He also asked Cooper, "[w]hy can't we set up your desk so you can lie flat while working?"  Next, he asked, "[a]re you taking any prescription medication that would prohibit you from working?"

32. After Cooper answered his questions, Paradise wrote, "ok then I think we need you to work from home and complete your financial tasks as you would normally including managing Valerie on office open/close.  Please coordinate with Shawn on office mgmt, copied here."

33. The following day, Tuesday, April 7, 2015, Cooper had an MRI, which showed central disc protrusion in his lower lumbar spine and the top of his sacrum.

34. On Wednesday, April 8, 2015, Cooper emailed Paradise and Chafkin a status update and sent them the original disability certificate from his doctor.  Around the same time, Paradise asked Cooper to close the books for March, a task which was not due until April 15, 2015.  Cooper did so and also complied with Paradise's request that he prepare the April 1 – 15 payroll for Paradise's approval, in addition to the other tasks on which he was working.

35. On Thursday, April 9, 2015, Cooper sent the Founders an extended disability certificate (from his physician) through approximately April 18, 2015 and continued to work from home.

36. On Friday evening April 10, 2015, Chafkin fired Cooper via email for "Cause" and purported to revoke his vested Class B shares.  Having contemplated terminating Cooper three weeks previously *not* for Cause, Skillz fired Cooper punitively and without contractual Cause, because of his episodic disability.

37. In his termination email, despite his knowledge of Cooper's disability certification and the work he had been performing from home, Chafkin stated, "because you have not been to work since April 1, 2015, you have not earned any additional salary or other wages and therefore no further compensation will be provided to you from the company."

38. Despite providing services and/or using paid sick and/or paid personal days (which were unlimited, per Company policy), Cooper's payroll for the last two weeks was cancelled and he has not been paid his final wages and benefits for the period April 1-10, 2015.

39. In the midst of extensive medical appointments and treatments, Cooper's health insurance was terminated. Skillz did not timely issue Cooper a COBRA notice, causing him to incur medical bills and additional stress.

40. When Cooper was wrongfully terminated, his forfeited employee stock was over 1.5 years vested.

41. When Cooper was wrongfully terminated, the Company was actively pursuing Series B financing, which Paradise and Chafkin widely represented would increase the value of the Company three-fold.

42. Notably, it was common practice within the Company to give employees raises and additional employee stock on or around their one-year anniversary of working at the Company. Yet with respect to Cooper, Paradise asked that he defer his anniversary raise and additional employee stock award until after the Series B funding had closed, as the Company was low on funds and was close to running out of money. He further promised Cooper that he would be "treated well" for deferring his raise and additional option awards.

43. On information and belief, in June of 2015, Skillz obtained $30 Million in Series B financing.

44.     As a result of his wrongful termination, Cooper has lost salary and health benefits, the value of his vested stock, the value of his unvested stock, and the increase in stock value attendant to the imminent Series B financing round.  He has also suffered emotional distress and has incurred attorneys' fees and costs.

## COUNT I

### DISABILITY DISCRIMINATION (ADAA)
### (Against Defendant Skillz)

45.     Plaintiff incorporates paragraphs 1 through 44 above.

46.     Cooper's back disorder is a covered disability under the ADAA, 42 U.S.C. § 12102(4)(D), because although it is episodic in nature, when active it substantially limits multiple major life activities (walking and bending/sitting) and the operation of a major bodily function (musculoskeletal).

47.     Even if Cooper's back disorder was not a covered disability, Skillz "regarded" Cooper as having a disabling impairment and terminated him in violation of the ADAA.

48.     Skillz also failed to reasonably accommodate Cooper's episodic impairment and failed to engage in an interactive process or dialogue about accommodating Cooper's actual or perceived disability.

49.     Skillz further retaliated against Cooper for seeking a reasonable accommodation for his episodic disability.

50.     As a result of Defendants' unlawful conduct, Cooper has suffered economic damages in an amount to be proven at trial, emotional distress, pain and suffering, and has incurred attorneys' fees and costs.

## COUNT II

### DISABILITY DISCRIMINATION (M.G.L. c. 151B)
### (Against All Defendants)

51.    Plaintiff incorporates paragraphs 1 through 50 above.

52.    By its above-described contact, Defendant Skillz engaged in handicap discrimination in violation of Massachusetts law by terminating Cooper due to his actual or perceived disability, by failing to engage in an interactive process when it was on notice of Cooper's need for a temporary accommodation due to his episodic disability and by failing to reasonably accommodate him.

53.    Skillz further retaliated against Cooper for seeking a reasonable accommodation for his episodic disability.

54.    Defendants Paradise and Chafkin aided and abetted Skillz' disability discrimination.

55.    As a result of Defendants' unlawful conduct, Cooper has suffered economic damages in an amount to be proven at trial, emotional distress, pain and suffering, and has incurred attorneys' fees and costs.

## COUNT III

### BREACH OF CONTRACT
### (Against Defendant Skillz)

56.    Plaintiff incorporates paragraphs 1 through 55 above.

57.    Defendant Skillz revoked Plaintiff's vested Class B common shares without legal right to do so because Cooper had not engaged in any conduct that constitutes "Cause" as defined in the Employee Equity Agreement.

58.    As a result, Defendant breached the Employee Equity Agreement.

59. As a result of Defendant's breach of contract, Cooper has suffered economic damages in an amount to be proven at trial.

## COUNT IV

### BREACH of IMPLIED COVENANT of GOOD FAITH AND FAIR DEALING
### (Against Defendant Skillz)

60. Plaintiff incorporates paragraphs 1 through 59 above.

61. Both Plaintiff's at-will employment relationship with Defendant and the Employee Equity Agreement contain implied covenants of good faith and fair dealing requiring that neither party do anything that will injure the right of the other party to receive the benefits of these agreements.

62. Cooper fully performed his employment obligations and Skillz terminated Cooper in bad faith and unfairly interfered with Cooper's rights to receive the benefits of his employment and his employee equity.

63. As a direct and proximate result of Defendants' breach of these implied covenants, Cooper has suffered economic damages in an amount to be proven at trial.

## COUNT V

### NON-PAYMENT OF WAGES (G.L. c. 149 § 148 et seq.)
### (Against All Defendants)

64. Plaintiff incorporates paragraphs 1 through 63 above.

65. Defendants failed and refused to pay Cooper's final wages and benefits, which were earned, due and payable as of April 10, 2015 (his termination date).

66. Defendants' failure and refusal to pay Cooper's final wages and benefits violates the Massachusetts Wage Act.

67. Defendants are liable to pay Plaintiff his unpaid wages and benefits, trebled, plus his attorneys' fees and costs.

## COUNT VI

## TORTIOUS INTEREFERENCE WITH ADVANTAGEOUS RELATIONSHIP
### (Against Defendants Paradise and Chafkin)

68. Plaintiff incorporates paragraphs 1 through 67 above.

69. Plaintiff had an advantageous economic relationship with Skillz through his employment with and equity interests in the Company.

70. Defendants Paradise and Chafkin were aware of that advantageous relationship and intentionally interfered with it through improper motive or means.

71. As a direct and proximate result of Defendants Paradise's and Chafkin's tortious interference, Cooper has suffered economic damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court order:

(a) that Defendants compensate Plaintiff for the economic losses of his compensation, bonus, and equity that he had earned and/or would have earned at Skillz;

(b) that Plaintiff be awarded monetary damages to fairly compensate him for emotional distress and pain and suffering;

(c) that Plaintiff be awarded monetary damages to fairly compensate him for lost employment opportunities caused by Defendants' actions;

(d) that Defendants pay Plaintiff's costs and attorneys' fees resulting from this action;

(e) that Defendants pay Plaintiff his unpaid final wages and statutory interest thereon, trebled, plus attorneys' fees;

(f) that Defendants pay Plaintiff pre- and post-judgment interest;

(g) that Defendants be ordered to pay Plaintiff punitive damages; and

(h) such additional relief as may be just and proper which will make Plaintiff whole.

**Plaintiff Requests a Jury Trial on All Issues and Causes of Action Contained in this Complaint.**

> Respectfully submitted,
> Plaintiff Eric Cooper,
> By his attorneys,
>
> */s/ Jody L. Newman*
> Jody L. Newman (BBO #542264)
> Julia W. McLetchie (BBO #671106)
> COLLORA LLP
> 100 High Street, 20th Floor
> Boston, MA   02210
> (617) 371-1000
> jnewman@collorallp.com
> jmcletchie@collorallp.com

Dated:  September 9, 2015